IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:22-CR-00608-2 |
| | § | HOUSTON, TEXAS |
| v | § | MONDAY, |
| | § | DECEMBER 19, 2022 |
| ANTONIO HOPKINS-YEZENO | § | 11:19 A.M. TO 1:02 P.M. |

**ARRAIGNMENT AND DETENTION HEARING**

BEFORE THE HONORABLE SAM S. SHELDON
UNITED STATES MAGISTRATE JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| COURTROOM CLERK: | SHANNON JONES |
| COURTROOM ERO: | SIERRA THOMAS |

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES:**

| | |
|---|---|
| FOR THE UNITED STATES OF AMERICA: | UNITED STATES ATTORNEYS OFFICE<br>Lisa Marie Collins, Esq.<br>1000 Louisiana Street<br>Suite 2300<br>Houston, TX 77002<br>713-567-9000 |
| FOR ANTONIO HOPKINS-YEZENO: | THE LEONARD FIRM<br>Brandon G. Leonard, Esq.<br>5300 Memorial Drive<br>Suite 750<br>Houston, TX 77007<br>281-815-0063 |
| FOR BRANDON MILSON: | TAUSK LAW FIRM<br>Eugene Tausk, Esq.<br>733 East 12-1/2 Street<br>Houston, TX 77008<br>713-429-5476 |
| FOR TORREE WHITE: | ATTORNEY AT LAW<br>George D. Murphy, Jr., Esq.<br>700 Louisiana Street<br>Suite 2350<br>Houston, TX 77002<br>713-658-1960 |
| FOR JOSUE RODRIGUEZ: | ATTORNEY AT LAW<br>J.A. (Joe) Salinas, III, Esq.<br>P.O. Box 941442<br>Houston, TX 77094<br>713-227-7100 |
| ALSO PRESENT: | Remone Delvillar, Interpreter |

1          **HOUSTON, TEXAS; MONDAY, DECEMBER 19, 2022; 11:19 A.M.**

2          THE COURT:  Okay.  Good morning, everybody.  We are

3     here on 22-608 with the remaining the Defendants.  Let me

4     start with Antonio Hopkins-Yezeno.  Is that you, sir?  And

5     you're represented by Mr. Leonard.

6          Good morning, Mr. Leonard.  Good to see --

7          MR. LEONARD:  Good morning, Your Honor.

8          THE COURT:   -- good to see you.

9          MR. LEONARD:  Good to see you, yes.

10          THE COURT:  And then -- you can sit down, sir.  Then

11     Brandon Milson.  Good morning, sir.  And you're represented by

12     Eugene, is it Tausk?

13          MR. TAUSK:  Yes, Your Honor.  Good morning.

14          THE COURT:  Okay.  Good morning, sir.

15          And then Torree White?  That's you, sir.  Good

16     morning, sir.  And you're here with George Murphy.

17          MR. MURPHY:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          And then last Josue Rodriguez is represented by Joe

20     Salinas.

21          MR. SALINAS:  Yes, Your Honor.

22          THE COURT:  Okay.  So let me start with there was --

23     I don't know if the initial appearance, if the Government

24     disclosure obligation was read into the Record, so I'm just

25     going to read it into the Record just to be safe.  Under Rule

1    5(f) counsel for the United States is ordered to comply with

2    its disclosure obligations under *Brady v Maryland* and its

3    progeny.  Failure to do so may result in the dismissal of the

4    charges, exclusion of evidence, adverse jury instructions,

5    contempt proceedings and sanctions.

6              All of you need to be arraigned, so let's get the

7    arraignment out of the way.  I'll start with Mr. Leonard.

8    Have you had an opportunity to review the indictment with your

9    client?

10              MR. LEONARD:  I have.  I have, Your Honor.

11              THE COURT:  Okay.  And does he waive formal reading,

12    enter a plea of not guilty and request a jury trial?

13              MR. LEONARD:  He does waive the formal reading and

14    he will enter in a plea of not guilty.

15              THE COURT:  Okay.  And, Mr. Tausk, same questions to

16    you.

17              MR. TAUSK:  Yes, Your Honor, I've had a chance to

18    review the pleading -- the indictment with my client.  Same,

19    we would waive the reading and my client enters a plea of not

20    guilty and we request a jury trial.

21              THE COURT:  Okay.  And, Mr. Murphy?

22              MR. MURPHY:  Yes, Your Honor, to all of those

23    questions.

24              THE COURT:  Thank you.

25              And, Mr. Salinas.

1        MR. SALINAS:  Yes, Your Honor.

2        THE COURT:  Okay.  So how we'll proceed is -- I

3    think you gentlemen may have been in here for the round, we'll

4    start with the Government.  If nobody -- we'll mark and enter

5    into evidence the Government's proffer as to your clients,

6    we'll do the same with the Pretrial reports, and then I will

7    turn it over to cross-examination for you all.

8        After you cross then I will leave it up to each one

9    of you to either proffer or call witnesses.  It's however you

10    want to do it.  As you may have heard me say to the other

11    folks, the Grand Jury's returned an indictment so I have to

12    presume there's probably cause, and so what helps me is to get

13    into the factors and not into what actually happened in this

14    case unless what happened in this case relates to the danger

15    to the community.

16        So let me -- let me start with Mr. Leonard, and ask

17    each -- does any of you have any objection to marking and

18    admitted as Government's Exhibit 1 for just the sole purpose

19    of this hearing the Government's proffer?

20        MR. LEONARD:  No objection

21        MR. MURPHY:  No, Your Honor.

22        THE COURT:  Okay.

23        MR. TAUSK:  No objection, Your Honor.

24        MR. SALINAS:  No objection, Your Honor.

25        THE COURT:  Okay.  And then the same questions to

1    each of you as to your clients' Pretrial report, all of this

2    is under seal, any objection to admitting that into evidence

3    solely for the purpose of this hearing?

4             MR. LEONARD:  No, Your Honor.

5             MR. MURPHY:  None from Mr. White, Your Honor.

6             MR. TAUSK:  Gene Tausk, Your Honor, no objection.

7             MR. SALINAS:  No objection, from Mr. Rodriguez, Your

8    Honor.

9             THE COURT:  Okay.  And I think just Mr. Murphy?  Oh.

10            MR. MURPHY:  No, no objections on behalf of Mr.

11   White.

12            THE COURT:  Okay.  Great.

13            Okay.  Ms. Collins, go ahead.

14            MS. COLLINS:  Yes, Your Honor.  The United States

15   would call Jason Myszka to the stand.

16            THE COURT:  Okay.  And the important thing for all

17   of you, I don't care whether you sit or stand, just make sure

18   you have a microphone that you speak into so we can have an

19   adequate record.

20        (Witness sworn.)

21            THE COURT:  And then just one other caveat, since we

22   have an interpreter, if you call all remember to try to speak

23   and methodically so we can get a good interpretation.

24            Go ahead, Ms. Collins.

25                        DIRECT EXAMINATION

1    BY MS. COLLINS:

2    Q    Could you state your name for the Record, spelling your

3    last name?

4    A    Jason Myszka, M-Y-S-Z-K-A.

5    Q    And what do you do for a living?

6    A    Special agent with the FBI.

7    Q    And how long have you been with the FBI?

8    A    Almost 7 years.

9    Q    And prior to that were you actually with the Houston

10   Police Department?

11   A    Yes, I was.

12   Q    And so how many years total law enforcement experience do

13   you have?

14   A    Almost 17.

15   Q    All right.  Prior to coming to court today did you have

16   the opportunity to review what I've -- is titled The 10:30

17   a.m. Proffer?

18   A    Yes.

19   Q    And after review is it accurate as to what your testimony

20   would be today?

21   A    Yes.

22   Q    All right.

23            THE COURT:  Before I turn it over to Mr. Leonard, I

24   forgot to ask, does -- any of the defense attorneys, does

25   anybody have anything that we need to discuss, does anybody --

1    in the first round people wanted to go tomorrow or wanted more

2    time, or there was other issues, is there any other issues

3    before we jump into cross-examination that you wanted to bring

4    to my attention?

5            MR. MURPHY:  None from Mr. White, Your Honor.

6            THE COURT:  Okay.

7            MR. SALINAS:  None from Mr. Rodriguez, Your Honor.

8            MR. TAUSK:  None from Mr. Milson, Your Honor.

9            MR. LEONARD:  None from Mr. Hopkins-Yezeno.

10           THE COURT:  Okay.  Does anybody have a preference

11   who goes first?  I'll leave it up to you all.  You want to go

12   first, Mr. Leonard.

13           MR. LEONARD:  Sure.

14           THE COURT:  Okay.  Go ahead.

15           MR. LEONARD:  May I proceed?

16           THE COURT:  Yes, thank you.

17           MR. LEONARD:  Thank you.

18                     CROSS-EXAMINATION

19   BY MR. LEONARD:

20   Q    Good morning, Special Agent -- is it Myszka?

21   A    Yes, sir.  Good morning.

22   Q    Good morning.  And I represent Mr. Antonio Hopkins-

23   Yezeno.  Tell me how you -- how you initially came across Mr.

24   Hopkins-Yezeno in your investigation.

25   A    So there was an investigation into The Sauce Factory gang

1    and Mr. Hopkins was identified at one time as a member of this

2    gang.

3    Q    Okay.  And when you say The Sauce Factor gang, that's

4    also a record label.  Right?

5    A    Correct.

6    Q    Okay.  And they produce and distribute music.

7    A    Yes.

8    Q    Okay.  And this is a pretty popular record label.  Is

9    that correct?

10   A    Yes.

11   Q    Okay.  Tell me, what did you -- what did you learn about

12   Mr. Hopkins-Yezeno as part of your investigation?

13   A    Based off of his criminal activity and what's portrayed

14   on social media and through open sources, source reporting was

15   identified as somebody that traffics narcotics.

16   Q    Okay.  And initially when -- approximately when did he

17   first come across law enforcement's radar?

18   A    Say -- sorry, it's been a minute -- I would say it's the

19   spring of 2020.

20   Q    Okay.  So somewhere April, March -- April, May of 2020?

21   A    Correct.

22   Q    Okay.  And were there any activities initially that law

23   enforcement investigated?

24   A    Yes.

25   Q    Okay.  Can you tell me about those?

1    A    So within this gang identifying different members, their

2    roles within the gang in the initial stages.

3    Q    Okay.  And from what you were able to determine what was

4    Mr. Hopkins's role in the gang?

5    A    So Mr. Hopkins was one of the individuals who -- I should

6    say one of the founders or one of the initial members within

7    this rap group that evolved into The Sauce Factory, and so

8    again, he was someone with strong ties to leadership within

9    the gang based from the onset of this rap label.

10   Q    Okay.  About how many people would you estimate are a

11   part of this gang?

12   A    I would say nationwide somewhere between 150 to 200.

13   Q    And when you say Mr. Hopkins was in the leadership of

14   this gang, specifically what did he do, what did you observe,

15   what did you uncover as a part of your investigation that led

16   you to believe that he was a part of the leadership?

17   A    Right.  So when The Sauce Factory was established, so

18   these close associates are in the leadership of the gang.  So

19   again, the rap label creation, he was around for that part of

20   the transformation of The Sauce Factory.

21   Q    Okay.  And what are you basing that on?

22   A    There is some financial records and I believe that an LLC

23   was established for the different rap groups and it came about

24   within that time period.

25   Q    Okay.  But since that LLC has been established you are

1    aware that The Sauce Factory has operated a legitimate

2    business since then.

3    A    The rap part of it?

4    Q    Right.

5    A    Yes.

6    Q    Okay.  And Mr. Hopkins-Yezeno is a part of that as well.

7    Right?

8    A    Yes.

9    Q    Okay.  I want to turn your attention to the transactions

10   that you've listed in the proffer that was submitted to the

11   Court today.  First starting with the incident on May 26,

12   2021, can you tell me briefly about that incident?

13        THE COURT:  Do you need a copy of the proffer?  Do

14   you want me to give you a copy?

15        THE WITNESS:  I -- sorry.

16        (Pause in the proceedings.)

17        THE WITNESS:  Yes, through the use of a confidential

18   informant a controlled buy was performed and Mr. Hopkins sold

19   pills containing methamphetamine to a confidential source.

20   BY MR. LEONARD:

21   Q    Okay.  Was this transaction recorded?

22   A    Yes.

23   Q    Was it recorded with both audio and visual equipment?

24   A    Yes.

25   Q    Okay.  And from your knowledge who were the parties that

1    are captured on that audio and visual equipment?

2    A    Mr. Hopkins and the CHS.

3    Q    Okay.  And are you aware if during that transaction Mr.

4    Hopkins -- are you alleging that he used or possessed a

5    firearm at that time?

6    A    I don't believe so.

7    Q    Okay.  Are you aware of any threats of violence during

8    that transaction --

9    A    No.

10    Q    -- that you investigated.  Okay.

11    A    No.

12    Q    What about the transaction on June 16, 2021, can you tell

13    me about that transaction?

14    A    So very similar where a confident source was used to make

15    a controlled purchase from Mr. Hopkins.

16    Q    Okay.  Same thing, was that transaction recorded?

17    A    Yes.

18    Q    Both audio and visual?

19    A    Yes.

20    Q    Okay.  And were you able to identify either of the

21    parties on that recording?

22    A    Yes.

23    Q    And who were they?

24    A    Mr. Hopkins and the confidential informant.

25    Q    Okay.  Same thing, are you aware of any guns or firearms

13

1      that were being used during that transaction?

2      A    No.

3      Q    Okay.  Any threats of violence during that transaction?

4      A    No.

5      Q    Okay.  Same thing for all of these transactions, are you

6      aware of any guns or firearms that were used or possessed?

7      A    No.

8      Q    Okay.  Are you aware of Mr. Hopkins carrying out any

9      threats of violence during the course of your investigation?

10     A    I know that there were violent acts that were discussed,

11     his levels of involvement vary, but through intercepted phone

12     calls there were several incidents where violence was

13     discussed with other parties, yes.

14     Q    Okay.  But in terms of Mr. Hopkins-Yezeno specifically

15     did your investigation uncover him to be involved in or

16     personally participated in any violent acts?

17     A    I would say yes.  The way that he discussed on these

18     phone calls there was knowledge and firsthand knowledge of

19     violent activities that occurred that he was a part of or

20     around --

21     Q    Okay.  Are you --

22     A     -- yes.

23     Q     -- are you aware of him being present during any acts of

24     violence?

25     A    I can't pinpoint one, no.

14

1   Q    Okay.  Do you have any specific -- any specific

2   information from any witness or surveillance or any other

3   evidence that would specifically point to him as being a part

4   of any violence?

5   A    No.

6   Q    Okay.  These narcotics transactions that Mr. -- that you

7   allege Mr. Hopkins was involved in, are you aware of anyone

8   that died or suffered serious bodily injury as a result of

9   these transactions?

10  A    No.

11  Q    Okay.  Do you know -- do you know -- are you alleging

12  that Mr. Hopkins was involved in the importation of any

13  specific narcotics?

14  A    Well, I know that when he traveled from Los Angeles to

15  Houston there was narcotics and marijuana that was transported

16  back and forth so, yes.

17  Q    Okay.  And are you alleging that he was specifically

18  involved in the possession and transportation of the

19  narcotics --

20  A    Yes.

21  Q     -- on these trips?

22  A    Yes.

23  Q    Okay.  Tell me about that.

24  A    Again, through intercepted phone calls he had taken a

25  trip to California for approximately 2 weeks, and there was

1    discussion of bringing back marijuana and sending marijuana

2    from California to Houston.

3    Q    Okay.  And approximately when are you alleging that this

4    transaction took place?

5    A    So that would be in July of 2021.

6    Q    And what were the alleged quantities and the type of

7    substance that was transported during that time?

8    A    The different drugs were promethazine, codeine cough

9    syrup, and marijuana, and I can't recall the exact quantities.

10   Q    Okay.  Was any of the -- were any of these narcotics

11   seized as a part of your investigation?

12   A    No, they were not.

13   Q    Okay.  So how are you -- how do you know that it actually

14   took place?

15   A    I guess I don't.  We're based off the phone calls.

16   Q    Okay.

17   A    Yes.

18   Q    Are you aware of Mr. Hopkins using or doing any mass

19   marketing or distributing any of these controlled substances

20   by use of a computer?

21   A    Through Instagram, yes.

22   Q    Okay.  And tell me about that.

23   A    There's promotion on Mr. Hopkins's Instagram account of

24   him being in possession of and selling marijuana.

25   Q    Okay.  What about any other controlled substances?

1    A    There are some for promethazine cough syrup as well.

2    Q    Okay.  Are you aware of Mr. Hopkins maintaining a premise

3    or a home for the purpose of manufacturing or distributing a

4    controlled substance?

5    A    At the present time, no.

6    Q    All right.  What about distribution to any individual,

7    vulnerable individual or elderly person or children or

8    anything like that?

9    A    I can't say.  I don't know.

10   Q    Okay.  Are you aware of Mr. Hopkins being involved in any

11   witness intimidation or destroying evidence or otherwise

12   obstructing justice?

13   A    No, sir.

14   Q    Okay.  Now I want to talk -- I want to turn your

15   attention to the circumstances surrounding Mr. Hopkins's

16   arrest recently.  Were you a part of the team that arrested

17   him?

18   A    I was overseeing many teams.

19   Q    Okay.  But you are aware of the facts and circumstances

20   surrounding his arrest.  Correct?

21   A    Yes.

22   Q    Okay.  And tell me about that, can you --

23   A    I know that a SWAT team with the Houston Police

24   Department executed a federal warrant on Kinbrook I believe is

25   the name of the street, and he was placed under arrest.

1    Q    Okay.  And was there any -- to your knowledge was there

2    any incident when Mr. Hopkins was taken into custody?

3    A    None that was reported to me.

4    Q    Okay.  As far as you know he was respectful and

5    cooperative.

6    A    Yes.

7    Q    Okay.  Do you know if there is surveillance or audio or

8    visual recording of the SWAT team's arrest of Mr. Hopkins?

9    A    I'm not sure on that.

10   Q    Do you know if Mr. Hopkins made any statements at that

11   time?

12   A    Not that I know of.

13   Q    Okay.  And this residence where he was arrested at, do

14   you have any information on where exactly he was living at the

15   time?

16   A    Right.  I believe it was a family member, possibly

17   mother.

18   Q    Okay.  Were there any -- was Mr. Hopkins in possession of

19   any firearms or weapons at that time?

20   A    No.

21   Q    Okay.

22             MR. LEONARD:  Judge, I think I'm going to pass the

23   witness at this time.

24             THE COURT:  Okay.  Thank you.

25             Mr. Tausk?

1          MR. TAUSK:  (Indiscernible).

2          THE COURT:  Yeah.

3                    CROSS-EXAMINATION

4    BY MR. TAUSK?

5    Q    Good morning, sir.

6    A    Good morning.

7    Q    My name is Gene Tausk, I represent Mr. --

8          THE COURT:  I don't know if that --

9          MR. TAUSK:  -- Brandon Milson.

10          THE COURT:  -- microphone works, so maybe pull one

11   of the other ones.  Yeah, there you go.

12          MR. TAUSK:  Okay.  Thank you.  Can you hear me now?

13          THE COURT:  Yep.  Perfect.

14          THE WITNESS:  Yeah.

15   BY MR. TAUSK:

16   Q    Sir, my name is Gene Tausk, I represent Mr. Brandon

17   Milson.  I'd just like to follow up with the questions that

18   were asked previously.  Do you have in front of you the

19   proffer that was I believe given to you this morning?

20   A    I do.

21   Q    Okay.  And if you would, please, refer to the bottom

22   third of the proffer.  It states that on August 10, 2021

23   Hopkins, referring to Mr. Antonio Hopkins-Yezeno, along with

24   Brandon Milson, were stopped on traffic and had over 1,000

25   grams of pills containing methamphetamine inside a vehicle.

1    This traffic stop was initiated on the way to meet a CHS.  Did
2    I read that correctly, sir.
3    A    Sorry, I'm just pulling the document.  (Perusing
4    document.)  Yes.
5    Q    Okay.  And, sir, if I'm going to understand this report
6    correctly, were you specifically looking for Mr. Hopkins and
7    Mr. Milson just happened to be along for the ride?
8    A    Through intercepted calls of Mr. Hopkins we identified
9    Mr. Milson as a party that was supplying and had access to
10   these pills.
11   Q    Okay.  Was -- I'm just looking at the 4 corners of this
12   report, or this proffer.  Aside from this one instance on or
13   about August 10, 2021 did you stop or have any reason to
14   arrest Mr. Brandon Milson?
15   A    Before that day, or on that day?
16   Q    Before that day or after that day.
17   A    So before that day, and I can get you the date, Mr.
18   Milson was identified as the driver for Mr. Hopkins on one or
19   the other transactions.
20   Q    When you say driver, is that -- am I to take that as
21   meaning he was like a chauffeur?
22   A    He drove him to one of the drug transactions, correct.
23   Q    But simply as a driver.  Is that correct?
24   A    Correct, he was identified as being in the vehicle and
25   drove Mr. Hopkins to the transaction.

1   Q    Thank you.  In this -- on or about August 10, 2021 did

2   Mr. Milson have these pills containing methamphetamine on his

3   person?

4   A    They were inside the vehicle, inside of a bag where Mr.

5   Hopkins and Mr. Milson were sitting.

6   Q    No, I understand that, sir, but when I say on his person

7   maybe I should be more specific.  Was Mr. Milson actually

8   carrying these pills?

9   A    In his pockets?  No.

10  Q    Okay.

11  A    They were in a bag.

12  Q    They were in a bag.  And where was that bag located to

13  the best of your knowledge?

14  A    Inside the vehicle in the back seat where they were

15  sitting.

16  Q    And Mr. Milson was in the front seat.  Is that correct?

17  A    I believe he was in the back seat.

18  Q    Well, I believe you stated earlier that Mr. Milson was

19  driving the car.

20  A    This is 2 separate incidents.  I'm sorry.

21  Q    Okay.  So Mr. Milson was in the back seat of his car.

22  A    Correct.  On August 10, yes.

23  Q    On August 10, yes.

24  A    Yes.

25  Q    And somebody else was driving the vehicle?

1    A    Yes.

2    Q    Okay.  Who was driving the vehicle?

3    A    It was a rideshare vehicle.

4    Q    Okay.  So like an Uber or something like that?

5    A    Correct.

6    Q    Okay.  Now other than this instance and your testimony

7    regarding intercepted communications, was there ever any time

8    when Mr. Milson was stopped or detained for allegedly dealing

9    with -- dealing drugs?

10   A    Yes.

11   Q    Okay.  But is that reflected on the 4 corners of this

12   report?

13   A    The proffer agreement?

14   Q    Yes, are you --

15   A    It's not on there, correct.

16   Q    Okay.  So according to the 4 corners of this proffer

17   agreement the only time that Mr. Milson was allegedly involved

18   in narcotics trafficking was on or about August 10, 2021.

19   Correct?

20   A    Correct.

21   Q    Okay.  Let's move on.  I'd like to have you please look

22   at Page 3 of this proffer agreement.  And once again, I'm

23   referring to the bottom third of this document, and I'm going

24   to read this into the Record.  It says, Brandon Milson,

25   intercepted calls revealed consistent communications by Milson

1    discussing narcotics and firearms.  Did I read that correctly,

2    sir?

3    A    Yes, you did.

4    Q    Okay.  Sir, I've noticed for the other Defendants in this

5    hearing you have a download of their phones.  Do you have a

6    download of Mr. Milson's phone?

7    A    We do not.

8    Q    And why is that, sir?

9    A    Well, because we do not, it's not part of the

10   investigation.

11   Q    Okay.  Well, the reason I'm asking you these, I don't

12   want -- the other attorneys I'm sure will ask about this, but

13   the downloaded phones that you have indicate some what might

14   be interpreted as disturbing images, but you have no such

15   disturbing images from Mr. Milson.  Is that correct?

16   A    We do have disturbing images of him holding firearms,

17   yes.

18   Q    Okay.  But referring to the 4 corners once again, sir, of

19   this proffer agreement are there any images in this proffer

20   agreement?

21   A    No, there are not.

22   Q    Okay.  As a matter of fact, sir, the only thing I see

23   regarding Mr. Milson's phone is a statement that there were

24   intercepted calls revealing consistent communications by

25   Milson discussing narcotics and firearms.  Correct?

23

1    A    Correct.

2    Q    Okay.  These intercepted calls, sir, who are they going

3    to?

4    A    Mr. Hopkins.

5    Q    Okay.  But you did not put that in this report -- scratch

6    that.  The US Attorney did not put this in his report.

7    Correct?

8              THE COURT:  No, wait, so let me -- I think there's a

9    disconnect going on.  The proffer is just what the

10   Government --

11             MR. TAUSK:  No, I understand, Your Honor.

12             THE COURT:   -- wants to put forward.  They're under

13   no obligation to put everything in there, they're just putting

14   forward.  But when you all ask questions, if you open up the

15   door to him, it's not like I can't consider what he's going to

16   say, or she can't ask follow up, she's just giving you some

17   information because it's a rebuttable presumption to put

18   forward.  I mean technically she wouldn't have to put forward

19   anything because the burden's on you.  So I don't want to get

20   caught up in semantics that somehow the Government's limited

21   by what -- by the 4 corners of this document.

22             MR. TAUSK:  Yeah, Your Honor, I understand that, I

23   just --

24             THE COURT:  Okay.

25             MR. TAUSK:   -- I'm sure the Court has realized this

1          already, given the accusations against the other Defendants,

2          the information regarding my client is remarkably sparse on

3          this agreement -- on this proffer.

4                    THE COURT:  Right.  I agree, but that's also why I

5          told all of you all, this isn't a discovery hearing --

6                    MR. TAUSK:  Sure.

7                    THE COURT:   -- and did I really -- you know, I want

8          to get into the other factors.  I'm going to presume -- I'm

9          not going to make any statements about the strength of the

10         case, but a Grand Jury has indicted him so I have to presume

11         there's probable cause and so --

12                   MR. TAUSK:  Understood, Your Honor.

13                   THE COURT:  Okay.

14                   MR. TAUSK:  By the way, Your Honor, if I may indulge

15         the Court?

16                   THE COURT:  Sure.

17                   MR. TAUSK:  I remember earlier during the previous

18         hearing you had stated -- and the Court had stated you were

19         not looking into whether or not these Defendants were a flight

20         risk, but rather if they were a danger to the community.  Is

21         that still the Court's position?

22                   THE COURT:  Some -- some of them may -- some of them

23         have -- some of them have other ties.  I don't think for -- I

24         think your client is a life-long resident of Houston, so I

25         believe as to Mr. Milson I don't believe -- I'm sorry, did I

1    get -- yeah, you have Mr. Milson, I don't --

2              MR. TAUSK:  Yes, Your Honor.

3              THE COURT:   -- believe he's -- there's other issues

4    but I don't believe he's a flight risk.

5              MR. TAUSK:  Okay.  I just wanted to --

6              THE COURT:  Yes.

7              MR. TAUSK:   -- confirm the Court's position on it.

8    Thank you, Your Honor.

9    BY MR. TAUSK:

10   Q    Okay.  Sir -- Mr. Myszka, were you present when Mr.

11   Milson was arrested?

12   A    No.

13   Q    Okay.  To the best of you knowledge, sir, did you

14   ever view Mr. Milson with firearms?

15   A    On Instagram, yes.

16   Q    On Instagram.  Okay.  And did you ever -- to the best of

17   your knowledge, when Mr. Milson was arrested did he have

18   firearms on him?

19   A    No.

20   Q    Okay.  To the best of your knowledge, when Mr. Milson was

21   arrested did he make any threats towards anybody arresting

22   him?

23   A    No.

24   Q    Okay.  And to the best of your knowledge, when Mr. --

25   scratch that.  Before Mr. Milson was arrested do you have any

1    knowledge or any indication that he was making threats towards

2    anybody else?

3    A    No.

4    Q    And, sir, do you have a copy of the Pretrial report?

5    A    I do not.

6    Q    Well, sir, I believe you understand that the Government's

7    recommending that Mr. Milson be detained until trial.  Is that

8    correct?

9    A    Yes.

10    Q    Okay.  And part of the reason that the Government is

11    asking that he be detained is because he's -- as the Court

12    just stated, he's not a flight risk, but there are questions

13    as to whether or not he's a danger to the community.  Is that

14    correct?

15              THE COURT:  He may have a different opinion than I

16    do, but I think the Government's position is he's both, but --

17    so I don't want to --

18              MR. TAUSK:  Okay.

19              THE COURT:  -- I don't want to --

20              MR. TAUSK:  I apologize, Your Honor.

21              THE COURT:  -- be confused.  Yeah, that's just my

22    position, but --

23              MR. TAUSK:  Okay.  Well, let's move on then.

24    BY MR. TAUSK:

25    Q    But if I understand your statements correctly, sir, you

1    do have any firsthand knowledge of any violent tendencies of

2    Mr. Milson.  Is that correct?

3    A     Firsthand, no.

4    Q     Okay.

5         MR. TAUSK:  Pass the witness, Your Honor.

6         THE COURT:  Okay.  Thank you.

7         Mr. Murphy?

8         MR. MURPHY:  Thank you, Judge.

9                        CROSS-EXAMINATION

10    BY MR. MURPHY:

11    Q     Special agent, I'd like to start just at the end when a

12    team of law enforcement officers arrested Mr. White last week.

13    I'm assuming you were not involved in that arrest?

14    A     I wasn't there, I was --

15    Q     Yes, sir.

16    A      -- again, overseeing kind of everything.

17    Q     Yes, sir.  When Mr. White was arrested have you heard

18    that he was possessing a gun?

19    A     No.

20    Q     Was he violent in any way?

21    A     No.

22    Q     Did he fight back?

23    A     No.

24    Q     Did he run?

25    A     No.

28

1    Q    Then I guess as far as these things can go it was as

2    peaceful as it could have happened.

3    A    Correct.

4    Q    How did law enforcement know where to go to -- to arrest

5    him?

6    A    There was different addresses that were surveilled and he

7    was observed there several weeks, 2 weeks before that and --

8    Q    Got it.

9    A    -- consistently.

10    Q    Yes, sir.  The indictment alleges that the offense, this

11    federal case occurred on September 15 of 2021.

12    A    Yes.

13    Q    And is -- are you aware of other alleged sales that were

14    conducted by Mr. White?

15    A    No.

16    Q    Are you aware of any leadership role that Mr. White

17    allegedly played in this group?

18    A    No.

19    Q    And you discussed, and in the proffer it discusses how

20    all of these transactions occurred with a CHS, a confidential

21    human source.  Right?

22    A    Yes.

23    Q    Now I'm assuming that -- please, I'm not going to ask you

24    who it is, and don't tell me who it is, all right, but I'm

25    assuming you had discussions with this person?

1    A    Yes.

2    Q    And I want to ask you about that person, please, without

3    revealing anything personal about them.  Is this person paid

4    by the federal government?

5                MS. COLLINS:  Your Honor, I'm going to object --

6                THE COURT:  Okay.

7                MS. COLLINS:   -- to outside --

8                THE COURT:  I'll -- look, I'll let him ask a few

9    questions, but then I want to move on because that has nothing

10    to do with this hearing.

11                So you can -- I presume I know the answer, but you

12    can give it.

13                THE WITNESS:  Yes.

14                THE COURT:  Yeah.  Okay.

15    BY MR. MURPHY:

16    Q    And was this person a person whose credibility was

17    questionable to you?

18    A    No.

19    Q    And -- but when you make sure that -- or you or law

20    enforcement make sure that every time they made these deals

21    there was video and audio?

22    A    Yes.

23    Q    And that exists in Mr. White's case.

24    A    Yes.

25    Q    In that case, on September 15 of 2021, were there any

30

1    guns involved in that -- during that transaction --

2    A    No.

3    Q    -- that you're aware of?  The proffer statement, or the

4    proffer offered by the Government brings up something I want

5    to discuss with you.  And it talks about a download of Mr.

6    White's cell phone.  Okay.  So, Special Agent, that relates to

7    a State Court case that's pending in Mr. -- I guess Mr. White.

8    Do you agree with that?

9    A    Yes.

10   Q    I'm curious how you -- do you agree with all of the

11   statements that are in this proffer?

12   A    Yes.

13   Q    And did you come up with this information yourself or did

14   other agents do it in helping Ms. Collins put this together?

15   A    Correct, the team of agents, yes.

16   Q    Team of agents.  But you personally -- how did you -- how

17   did you come up with these statements?

18   A    I know that there was an investigator with the Department

19   of Public Safety we spoke with.

20   Q    Right.  You spoke with them.  Did you do that personally?

21   A    Yes.

22   Q    And was that -- I want to say Larcen (phonetic)

23   (indiscernible).

24   A    That's correct.

25   Q    That's correct?  Okay.  But you talked with him

31

1      personally.

2      A    Yes.

3      Q    And you got the impression that -- because this seemed to

4      leave the impression that the Government has Mr. White's phone

5      and downloaded it.

6      A    Yes.

7      Q    And is that your -- the impression that you got from

8      Special Agent Larcen?

9      A    Yes.

10     Q    I call him special agent, he's a DPS guy.  Correct?

11     A    Correct.  You're correct in saying that.

12     Q    Yeah.

13     A    Yes, sir.

14     Q    And what's the -- so what's the phone number on that

15     phone, do you know?

16     A    I can't recall offhand.

17     Q    How do you -- how do you know that -- that the phone

18     that's in this proffer, that's discussed in this proffer was

19     Mr. White's phone?

20     A    Based off what I'm told by Special Agent Larcen.

21     Q    I see.  Did you read Special Agent Larcen's affidavit

22     that he drafted when he was asking for an arrest warrant in

23     State Court?

24     A    I've reviewed it, yes.

25     Q    Sure.  Now -- and in your memory does that affidavit that

1    he drafted, is that consistent with what this says right here
2    in the proffer?
3    A    I can't recall if it came --
4    Q    Okay.
5    A     -- from an affidavit or what it states exactly.
6    Q    All right.  Are you familiar with Starlight searches of
7    phones?  Have you heard of that?
8    A    They -- I have heard of it.
9    Q    A Starlight search of a phone, in order for a law
10   enforcement officer to do that, they don't actually need the
11   person's phone, do they?
12   A    I believe that's true.
13   Q    Okay.  So you came up with this number, 1,664, by talking
14   with Special Agent Larcen.
15   A    Correct.
16   Q    Now what -- I don't know how familiar you are with the
17   prostitution business, I hope not very much, but what is
18   common knowledge in that is that prostitution ads are often
19   re-posted frequently.  Do you know that to be the case?
20   A    I've heard that before.
21   Q    Yeah, and that's so they can grab the attention of the
22   search engines.
23   A    Okay.
24   Q    That's the reason for it?
25   A    That makes sense.

1    Q    So it says 1,664 posts.  That's -- it could be the same

2    ad posted every time.  Right?  Or the same girl.

3    A    Based on what you're saying, yes.

4    Q    Right.  And in the -- and in Sgt. -- or Special Agent

5    Larcen's affidavit he wrote in State Court, he only talked

6    about one lady, and the initials are AT.  Is that your memory?

7    A    That does sound -- I don't want to say exactly that it

8    was --

9    Q    Yeah.

10   A     -- again I don't recall every single distinct detail of

11   it so.

12   Q    That's very fair.  And I'm really not trying to trick

13   you --

14            THE COURT:  Okay.  Can I ask you a question, Mr.

15   Murphy?  So let me -- I wasn't -- when I looked at all this

16   before the hearing, I'm not -- I'm not focused on whether it's

17   1 or 1600.  My question is -- let me just ask you both the

18   chronology, and the point that I took from that is that he's

19   arrested on March 4, 2022, he's placed on a bond.

20            And now the point of this statement in Government's

21   Exhibit 1, the proffer, is that when -- at some point while

22   he's on bond his phone is found and that there's a promotion

23   of prostitution for -- advertisement still on his phone.  And

24   so the inference is he's still engaged in the same behavior

25   that he's on bond for.

1          MS. COLLINS:  Yes, and for clarification, when we

2    spoke to Agent Larcen, what he stated, and with that basis was

3    not for while he was on bond for Larcen's case that he filed,

4    there's another one filed by one the precincts -- it's my

5    understanding he has more than 1 promotion of prostitution

6    case pending.

7          THE COURT:  Okay.  But regardless the point is, and

8    I'll let Mr. Murphy -- is the point why this is in the proffer

9    is he's on bond in some case dealing with this criminal

10   conduct and he's still engaged in it to some degree, whether

11   we know it's --

12         MS. COLLINS:  Correct.

13         THE COURT:   -- there's a dispute about it.  It

14   could just be 1 post and then it gets re-posted 1100 times,

15   but there's -- that's the inference that's being made.

16         MS. COLLINS:  Correct.  Yes, Your Honor.

17         THE COURT:  Okay.  Mr. Murphy, that's how I took it

18   as, but I'll let you -- I just want to make sure that we were

19   all on the same page.  Okay.

20   BY MR. MURPHY:

21   Q    And in the -- this case that we've talked about here

22   that's discussed in the proffer, Mr. White was arrested on

23   that case and has received a bond in State Court.  Are you

24   aware of that?

25   A    Yes.

35

1    Q    And did you know that the State Court prosecutor in that
2    case recommended to the Judge that the bond should be $20,000?
3    A    I wasn't aware of that.
4    Q    And this prostitution case is still pending, it's not yet
5    adjudicated.  Do you agree?
6    A    That's what it seems to be, yes, based off of --
7    Q    Sure.
8    A     -- what the NCIC and all the records say --
9    Q    Thank you.
10   A     -- say.
11   Q    Thank you.  And His Honor brought up some dates, I'll
12   help to --
13   A    Okay.
14   Q     -- try to fill in some of the time line there.  This
15   case that's mentioned in the proffer, the date that it
16   allegedly occurred, if you know, was May 7 of 2021.  That is
17   not when it was filed, but when it occurred in the affidavit.
18   A    (Perusing document.)
19   Q    I'll tell you what, just to be efficient, do you have any
20   reason to disagree with that?
21   A    Was that in reference to the sex trafficking stuff -- or
22   the promotion --
23   Q    Correct.
24   A     -- I'm sorry?
25   Q    Correct.

1    A    Okay.  I don't know exact dates --

2    Q    All right.  Very good.

3    A     -- and everything that --

4    Q    Very fair.  That's very fair.  And I don't -- I don't

5    think, Special Agent, that risk of flight is a major issue.  I

6    could be wrong, but generally speaking you're not aware of Mr.

7    White failing to appear at any of his court appearances in

8    State Court.

9    A    I'm not aware of any of those situations, correct.

10   Q    And do you know now that he's on a -- he's on a GPS

11   monitor?

12   A    An ankle monitor, yes.

13   Q    When he was arrested he was on a monitor?

14   A    Yes.

15   Q    And did you know that he's been on a monitor for about 9

16   months?

17   A    I didn't know how long, I just know when we started

18   looking for him that he was on an ankle monitor.

19   Q    Okay.  Special Agent, that's all I have.

20             THE COURT:  Okay.  Thank you.

21             MR. MURPHY:  Thank you.

22             THE COURT:  Mr. Salinas?

23                     CROSS-EXAMINATION

24   BY MR. SALINAS:

25   Q    Yes, Special Agent, I represent Josue Rodriguez, and the

1    indictment basically has him listed with 14 individuals.

2    Correct?

3    A    Yes.

4    Q    And of the 14 individuals he's the only one that's

5    charged with felon in possession of a firearm.  Correct?

6    A    Yes.

7    Q    Okay.  Now you're aware that Mr. Rodriguez is a US

8    citizen from Puerto Rico.  Correct?

9    A    Yes.

10   Q    And his primary language is Spanish.

11   A    Yes.

12   Q    Okay.  And do you speak Spanish?

13   A    I do not.

14   Q    Okay.  You're the case agent on the case.  Correct?

15   A    Yes.

16   Q    Okay.  And according to the Government's proffer, Mr.

17   Rodriguez -- I guess it was an intercepted phone call which

18   led to you all have a traffic stop.  Correct?

19   A    Correct.

20   Q    Okay.  The intercepted phone call was between Mr.

21   Rodriguez and somebody else charged in this indictment?

22   A    Incorrect.

23   Q    Okay.  And that conversation would have been in Spanish.

24   Correct?

25   A    Yes, it was.

38

1   Q    Okay.  And the person that was actually listening to --

2   intercepted the conversation is actually fluent in Spanish and

3   he would know what was being said?

4   A    Yes.

5   Q    Who was that person?

6   A    I don't know the exact name of the person, but I know we

7   have trained certified linguists that were monitoring the

8   lines.

9   Q    Okay.  Now that conversation occurred on, according to

10  the proffer, September 12.  Correct?

11  A    Yes.

12  Q    Okay.  So I guess there's a 302 which says that I believe

13  you were surveilling Mr. Rodriguez's home.  Correct?

14  A    Yes.

15  Q    And you observed him get into a vehicle?

16  A    Yes.

17  Q    And that vehicle drove him to where?

18  A    Hitchcock, Texas.

19  Q    Okay.  And you continued surveillance at the Hitchcock,

20  Texas location?

21  A    Yes.

22  Q    Okay.  And then apparently September 13 at 12:10 a.m. he

23  got into another vehicle.  Correct?

24  A    Yes.

25  Q    That vehicle was stopped on traffic.

1    A    Yes.

2    Q    Was the vehicle that picked him up at his house and the

3    vehicle that picked him up in Hitchcock were they Ubers I

4    guess?

5    A    Rideshare vehicles, yes.

6    Q    Okay.  And the vehicle that was -- the September 13

7    vehicle was actually stopped on traffic.  Correct?

8    A    Correct.

9    Q    And Mr. Rodriguez was arrested?

10    A    Yes.

11    Q    For?

12    A    The firearm and also some narcotics were found in his

13    possession.

14    Q    Okay.  And I guess the stop was in Dickinson, Texas, so

15    it wound up going to Galveston County.  Correct?

16    A    Correct.

17    Q    Okay.  And he was charged in Galveston County with

18    unlawful carrying of a weapon by a felon?

19    A    Yes.

20    Q    2 possession charges, 1 was a felony and 1 was a

21    misdemeanor.  Correct?

22    A    Yes.

23    Q    Okay.  And you're aware that he was granted a bond on

24    those cases, are you?

25    A    Yes.

1    Q    So he had a $20,000 bond on the felony possession charge

2    and a $1500 bond on the misdemeanor possession charge and a

3    $20,000 bond on the weapons charge.

4    A    Yes.

5    Q    Okay.  And that all happened on September 13.  Correct?

6    A    Yes.

7    Q    And the feds actually picked up the case on December 14.

8    Correct?

9    A    Yes.

10    Q    So basically for 3 months he was complying with the

11    conditions of bond that had been issued to him by Galveston

12    County.  Correct?

13    A    To my knowledge, yes.  Actually -- I'm sorry.

14            THE COURT:  Go ahead.

15            THE WITNESS:  It just hit my memory, but I know that

16    he was actually called to -- in discussions with the court in

17    Galveston he was actually called back for marijuana.  I

18    believe that there was a urine test that came back and the

19    judge had called him there to discuss this with him because of

20    his violation of the condition actually.

21    BY MR. MURPHY:

22    Q    Okay.  But he was -- he was actually under bond

23    conditions of Galveston County at the time that he was

24    arrested for the federal charge.  Correct?

25    A    Yes.

41

1    Q    Okay.  So he was not placed back in the Galveston County

2    Jail for a violation.

3    A    The judge just spoke with him regarding the violation and

4    chose not to place him in jail.

5    Q    Okay.  Now there's -- in the Government's proffer there's

6    some images that I guess were downloaded off of his telephone,

7    off of his cell phone.

8    A    Yes.

9    Q    Okay.  And do you know where that cell phone is now?

10    A    It's in the possession of the FBI.

11    Q    Okay.  So when he got arrested in Galveston you all

12    maintained possession of the phone?

13    A    Correct.

14    Q    Okay.  And when you downloaded the images on the phone

15    did you all obtain a warrant to download the images on the

16    phone?

17    A    Yes, we did.

18    Q    And according to the proffer it has some photos of some

19    sales and distribution of firearms.  Correct?

20    A    Yes.

21    Q    Okay.  Now how do you link those to him?  Are you

22    basically stating that he was selling and distributing

23    firearms, or are they just firearms that are for sale?

24    A    Right.  So again, going to the intercepted phone calls

25    and kind of piecing what we found on the phone with the

1    intercepted phone calls, that is where we derived that theory
2    from.
3    Q   Okay.  So basically what you're stating is off of the
4    intercepted phone calls you have information that would lead
5    you to believe that Mr. Rodriguez was buying, selling and
6    distributing phones?
7    A   Phones?
8            THE COURT:  Yean --
9            THE WITNESS:  I'm sorry, can you repeat that?
10           THE COURT:  Not phones, firearms.  You said phones.
11           MR. MURPHY:  I'm sorry if I --
12           THE COURT:  Yeah.
13           THE WITNESS:  Yeah, so along with the other party,
14    correct.  It was discussed, yes.
15    BY MR. MURPHY:
16    Q   So basically Mr. Rodriguez is discussing selling
17    firearms --
18    A   Correct.
19    Q    -- off of what you determined off of text messages -- or
20    the intercepted phone calls.  Correct?
21    A   Correct.
22    Q   Okay.  Now you did pull Mr. Rodriguez's criminal history.
23    Correct?
24    A   Yes, I've seen it.
25    Q   Okay.  So the felony that he has is a prior -- is a

1    possession of a controlled substance out of Connecticut.

2    Correct?

3    A    Correct, and also in Puerto Rico.

4    Q    Okay.  According to the Pretrial Services Report the only

5    felony that shows on here is one out of Connecticut.  So are

6    you claiming there's a felony out of Puerto Rico?

7    A    Yes, there is.

8    Q    What -- which one would that be, what was that one?

9    A    I can't remember the exact wording of how the charge is

10   read, but it's basically a robbery with some type of weapon,

11   either a gun or a knife.

12          THE COURT:  Is that the 2010, or is that the 2009

13   that says -- the 2010 would say -- on our Pretrial report the

14   2009 is referred to as a misdemeanor and then there's the

15   2010, it says weapons law, illegal appropriation, larceny,

16   property.

17          THE WITNESS:  I believe that would be it, yes, sir.

18          THE COURT:  Okay.

19   BY MR. MURPHY:

20   Q    So you believe it's the 2010 one.  Correct?

21   A    Correct.

22   Q    So on the phone calls are you stating I guess now that

23   Mr. Rodriguez had telephone conversations with any one of the

24   other 14 -- or the other 13 that are charged in this

25   indictment?

1    A    No.  I'm sorry, could you repeat that?  I just --

2    Q    Okay.  There's 14 people charged in this indictment.

3    A    Yes.

4    Q    Mr. Rodriguez is 1 of them.

5    A    Correct.

6    Q    So out of the phone calls that you were monitoring is Mr.

7    Rodriguez communicating with anybody else that's in this

8    indictment?

9    A    No.

10            MR. MURPHY:  Pass the witness.

11            THE COURT:  Okay.  Anything else, Ms. Collins,

12    before we move on?

13            MS. COLLINS:  Just very, very briefly.

14            THE COURT:  Okay.

15                          REDIRECT EXAMINATION

16    BY MS. COLLINS?

17    Q    Because it does not state on the Pretrial report the

18    felony that you found out of Puerto Rico, have you received

19    confirmation that Rodriguez was, in fact, convicted of that

20    felony?

21    A    Yes, a sentence of 2 years.

22    Q    That's what I was going to ask.

23            MS. COLLINS:  That's all, Your Honor.

24            MR. LEONARD:  Judge, may --

25            THE COURT:  Okay.

1          MR. LEONARD:   -- may I --

2          THE COURT:  Yes, go ahead.

3          MR. LEONARD:   -- briefly?

4          THE COURT:  Okay.  But, yes, but we're not going to

5     get back into the case, are we?  I mean if it's not going to -

6     - if we're getting into probable cause and the evidence, it's

7     just not going to help me, but --

8          MR. LEONARD:  It's not --

9          THE COURT:  Okay.  Go ahead.

10          MR. LEONARD:   -- regarding probable cause.  Thank

11     you, Your Honor.

12                    RECROSS-EXAMINATION

13     BY MR. LEONARD:

14     Q     Agent Myszka, you were able to pull Mr. Hopkins's

15     criminal history.  Right?

16     A     Yes.

17     Q     And you're aware that he's not a convicted felon?

18     A     Correct.

19     Q     And he doesn't have any convictions for crimes where he's

20     alleged to have used violence.

21     A     I'd have to refer to it again --

22          THE COURT:  But he does have -- you mean a felony

23     conviction, or any conviction?

24     BY MR. LEONARD:

25     Q     Well, he doesn't have any felony convictions.  Right?

1                    THE COURT:  Okay.

2                    THE WITNESS:  Correct.

3          BY MR. LEONARD:

4          Q    Okay.  And you're now aware of any crimes where he is

5          personally alleged to have used violence.

6          A    I'd have to see the NCIC because I -- I don't want to

7          answer that without looking at it.

8                    THE COURT:  Wait, because I'm looking at a 2009 riot

9          participation felony, convicted of a lesser misdemeanor,

10         sentenced to 15 days confinement.  I don't know what that -- I

11         don't know what the underlying thing may have been --

12                   MR. LEONARD:  Sure.

13                   THE COURT:   -- other than riot participation but --

14                   MR. LEONARD:  Understood.

15         BY MR. LEONARD:

16         Q    Are you familiar with any of the facts of that particular

17         incident?

18         A    I'm not sure if I'm mixing that incident with another

19         incident --

20         Q    Okay.

21         A     -- so again, I'd have to look at everything on it again

22         but --

23         Q    Sure.  But it's fair to say that if he was alleged to

24         have used a gun or shot someone or something like that, you'd

25         be aware of it.  Right?

1   A    I'd need to see that again and read that report of what
2   was alleged there.
3   Q    Okay.  But as you stand right here you're not aware of
4   anything.
5   A    I've said I need to reference that report and read that
6   before I answer that.
7   Q    Okay.  Are you aware of Mr. Hopkins committing any
8   offenses while on bond?
9   A    I guess I'd have to look at his criminal record and see
10  if there's overlap, and I don't have it memorized to know if
11  he violated any of his conditions.
12  Q    Okay.  Well, you know that he was charged in November of
13  this year for possession of marijuana out of State Court.  Is
14  that correct?
15  A    Yes.
16  Q    Okay.  And as a part of your investigations are you aware
17  of any transactions that are alleged to have occurred since
18  he's been on bond for that offense?
19  A    No.
20  Q    Okay.  Have you had an opportunity to take custody of Mr.
21  Hopkins's phone?
22  A    Yes.
23  Q    Okay.  Have you been able to download that phone?
24  A    I'd have to check to see if the download actually is
25  through.

1   Q    Okay.  If you -- if there is a download, do you know were

2   you able to obtain a search warrant?

3   A    Yes, the search warrant was done if it's downloaded.

4   Q    Okay.  What about for his social media accounts, have you

5   been able to download or get a search warrant for any of that

6   information?

7   A    I believe so, yes.

8   Q    Okay.  What about Mr. Hopkins's ties to any of the other

9   individuals that are listed on this indictment?  Do you have

10  any knowledge of any communication or interaction between him

11  and those individuals?

12  A    Yes.

13  Q    Okay.  Any evidence that he was managing any of these

14  other individuals?

15  A    Managing.  Could you expand upon that, please?

16  Q    Sure.  Any evidence that he was in a managerial or

17  supervisory role or directing any of these individuals?

18  A    No.

19  Q    Okay.  And lastly, do you have any evidence that he was

20  involved -- I think I may have asked you this, I just wanted

21  to clarify, that he was involved in the selling or trafficking

22  of firearms?

23  A    No.

24  Q    Okay.  Any evidence that you believe -- that leads you to

25  believe that Mr. Hopkins is a flight risk?

49

1    A    I know based off of, again, when we were intercepting his

2    calls that he was in Los Angeles for an extended period of

3    time where he had somewhere to stay, pretty much every day

4    lived at this apartment out there.  So I would say it's fair

5    that he has connections outside of Houston that he feels

6    comfortable enough to go and stay there for an extended period

7    of time.

8    Q    Sure.  But whenever he went to Los Angeles he would

9    always come back here to Houston, Texas.  Correct?

10   A    He did come back here, yes.

11   Q    Okay.

12             MR. LEONARD:  I pass the witness, Judge.

13             THE COURT:  Okay.  So this is how we're going to

14   proceed.  We'll start with Mr. Leonard as to Mr. Hopkins.

15   It's a presumption case so the burden's on you.  What I'd

16   really like to focus on is that in the Pretrial report his

17   residence, his employment and his finances have not been

18   verified.  And so that's -- that's step 1.  So if you want to

19   go by proffer or witnesses, it makes no -- I have no

20   preference.

21             MS. COLLINS:  Your Honor, may the witness take --

22             THE COURT:  Sure.

23             MS. COLLINS:  -- his seat?

24             THE WITNESS:  Thank you, Judge.

25             (Witness steps down.)

1           THE COURT:  Okay.

2           MR. LEONARD:  May I proceed, Your Honor?

3           THE COURT:  Yes.

4           MR. LEONARD:  All right.  All right, Judge, so I

5      would -- I would like to proceed by way of proffer.  I want to

6      start with Mr. Hopkins's ties to the community and his --

7           THE COURT:  Okay.  But I'm not concerned about

8      flight risk.

9           MR. LEONARD:  Sure.

10          THE COURT:  It's danger to the community, and so in

11     my calculation if we don't have -- if we can't verify his

12     residence, employment or finances, that's the first step.

13          MR. LEONARD:  Sure.  Sure.  So, Judge, he has a ton

14     of family here in Houston.  Judge, many of these family

15     members are here today in court, specifically his aunt and his

16     uncle, the Kellys.  I've been in constant communication with

17     them since earlier this week.

18          They are long-time citizens of Harris County,

19     citizens of Baytown.  They are former business owners, they're

20     both retired.  They both have offered their residence as a

21     place for Mr. Hopkins to stay should the Court decide that he

22     would be released.  They've both indicated that they would be

23     willing to manage him and act as a third-party custodian, be

24     willing to supervise him and report him should he not follow

25     any of the rules that's --

1          THE COURT:  Say who they are one more time.

2          MR. LEONARD:  Sure.  They're his aunt and uncle.

3          THE COURT:  Okay.

4          MR. LEONARD:  And Pretrial Services has just spoken

5    with them recently --

6          THE COURT:  Okay.

7          MR. LEONARD:   -- so they're here in the courtroom

8    today.  And one thing about the Kellys, Judge, you know, Ms.

9    Kelly, who's his aunt, she's raised him since he was 2 years

10   old, she made it clear that he's a good person.  And one thing

11   in particular about 2 years ago he had her purchase a car for

12   him and he has consistently without fail made payments to her

13   on that car note, not missed a payment, and he's done that

14   monthly for almost 2 years.  And, Judge, I think that speaks

15   to his level of responsibility.

16         So the Kellys are very stable.  Like I said, they're

17   homeowners here in Crosby, I believe, Crosby.  Yeah, I think I

18   said Baytown, but they live in Crosby.  So they are very

19   stable residence, it's just those 2, they don't have any guns

20   in the home, they would be willing to take him in, Judge.

21         THE COURT:  Okay.

22         MR. LEONARD:  In terms of employment I spoke with

23   Mr. Mike Wallace who is the owner of Mike's Tattoos.  I

24   believe Mr. Wallace is here, he's here in the back.  He's let

25   me know that Mr. Hopkins has worked for him consistently since

1    2010 as a tattoo artist.  Very responsible employee, brings in
2    new business, he's never had any issues, never had any
3    problems with him, and he's indicated that Mr. Hopkins would
4    be welcome to come back and work for him.
5              THE COURT:  And did Pretrial interview him too?
6              MR. LEONARD:  I believe I provided that information
7    to --
8              THE COURT:  Okay.
9              MR. LEONARD:   -- Pretrial Services and I believe
10   they've had an opportunity to speak with Mr. Wallace.  If not,
11   he's here and available for them --
12             THE COURT:  Okay.
13             MR. LEONARD:   -- to speak to.  So that's his -- I
14   mean that's his -- that's his residence, he, you know, he has
15   other -- like I said, other family members who are here and
16   willing to support him, willing to -- he has a sister here, he
17   has a brother, just tons of family support that's here that's
18   willing to make sure that he follows all the Court's rules
19   and, you know, does everything that this Court asks him to do.
20             Also, Judge, I want to speak to, you know, his past
21   criminal history.
22             THE COURT:  Okay.  We're going to wait, we're --
23             MR. LEONARD:  Okay.
24             THE COURT:   -- just tell me what you want to
25   proffer and then after we get to everybody I'll let you make

1    arguments.

2         MR. LEONARD:  Okay.  Okay.  Okay.  So I just want to

3    proffer to the Court, you know, he doesn't have any felony

4    convictions, they're only misdemeanors and he has a pretty

5    strong record of showing up for court, no bond forfeitures in

6    the system that I can see.  So I think -- I think that he is

7    not a flight risk in that sense.  So thank you, Judge.

8         THE COURT:  Thank you.

9         Okay.  Mr. Tausk, I think there's the same issue

10   with Mr. Milson, that his residence, employment and his

11   finances weren't verified?

12        MR. TAUSK:  That is correct, Your Honor.  However,

13   based on my conversations with my client, that is his correct

14   address.

15        THE COURT:  Yeah, I know, but we need someone else

16   to verify it.  I mean just as Mr. Leonard just gave us names

17   of people that Pretrial could speak to.

18        MR. TAUSK:  No, I understand, Your Honor.

19   Unfortunately I've been unable to track down people who can

20   verify this.

21        THE COURT:  Okay.

22        MR. TAUSK:  If the Court wishes, I can readdress

23   this issue on Thursday.  The problem was over the weekend it

24   was just hard to get in touch with individuals, Your Honor.

25        THE COURT:  Okay.

1          MR. TAUSK:  These are either --

2          THE COURT:  No, I mean I'll hold off ruling, but

3     that's like the first step before I can even --

4          MR. TAUSK:  No, I understand, Your Honor.

5          THE COURT:   -- consider it, that we need those 3

6     things.

7          MR. TAUSK:  I understand, Your Honor.

8          THE COURT:  So if there's people that -- I mean

9     continue on, but I'll need -- if you want to provide it, I'll

10    wait till Thursday.

11         MR. TAUSK:  That'll be great, Your Honor.

12         THE COURT:  Okay.

13         MR. TAUSK:  I appreciate it very much.

14         THE COURT:  Okay.

15         MR. TAUSK:  Regarding -- well, the only other issue

16    then, Your Honor, if I understand correctly, is the issue of

17    his criminal history.

18         THE COURT:  Correct.

19         MR. TAUSK:  And I would point out the following to

20    the Court, Your Honor, which I'm sure the Court is already

21    aware, but this is very important, the -- my client does have

22    a history of appearing when necessary in court.  I don't

23    believe there's any issue that he's not appeared.  If you look

24    at the -- the only thing that's been noted on the Pretrial

25    Services Report is on Page 3 -- I'm sorry, Page 4, which

1       states that the only bond violation he had was failure to

2       comply with having GPS installed.

3               And certainly, as the Court is well aware, the

4       Federal Court system has a much more thorough process of

5       making sure GPS is installed.  So that's really not an issue

6       for my client, Your Honor, should this Court grant a pretrial

7       release.  The Court, being a Federal Court, would ensure that

8       GPS is installed and so that's really a non-issue.

9               Regarding everything else, Your Honor, there --

10      except for -- well, let's face it, except for 1 drug charge

11      which the Court is -- can see right in front of it, the rest

12      were all misdemeanor cases, Your Honor, which my client has

13      served very little jail time for.

14              THE COURT:  Okay.  Thank you.

15              So, Mr. Murphy.

16              MR. MURPHY:  Thank you very much, Your Honor.  In

17      the courtroom this -- I guess now, this afternoon, is Ms.

18      Tracy Johnson and Mr. Stephan Johnson.  That is Mr. White's

19      mother and his brother.  Ms. Johnson would tell you that of

20      course that she was born and raised here in Houston, Texas,

21      went to Madison High School, that her son, Torree, has always

22      lived in Houston.

23              She would say to you, Your Honor, that she works,

24      she has a business, she's an entrepreneur, she works and she

25      has a catering and food business.  Her business partner is

1    here with her.  And if the Court were to see fit to set

2    conditions of release, she could make sure that Torree has a

3    place to work and would always be with her.

4              She would also tell you that for the last 9 months,

5    Your Honor, roughly 9 months her son, Torree, has been on GPS

6    monitor out of the State Court system.  That monitor has

7    required him to be indoors 24 hours, 7 days a week.  He can't

8    go to the grocery store, he can't go to church.  And for those

9    last 9 months she would tell you that he has not had any

10   issues with that.

11             He has lived for those last 9 months and little bit

12   more with his brother, Stephan Johnson, who's here.  That Mr.

13   Johnson lives in Richmond.  He would also tell you that for

14   the last 9 months he's been with his brother.  His brother

15   hasn't even gone outside the door.

16             I've spoken with Mr. White's bondsman on the State

17   Court case and he has -- he told me that there's never been an

18   allegation by the State Court that Mr. White has failed to

19   report to court, or that over the last 9 months that he's

20   violated his GPS restrictions.  So by way of proffer, Judge,

21   that's -- that's what I have.

22             THE COURT:  Okay.  Thank you.

23             And then finally, Mr. Salinas.

24             MR. SALINAS:  Yes, Your Honor.  Mr. Rodriguez is 32

25   years old, he's from Puerto Rico, a US citizen.  He lived in

1    Puerto Rico until 2013 and lived in Connecticut where he lived

2    for 6 years there.  He's been in the Houston area since 2019.

3    His common-law wife, Genesis Cabrerra (phonetic) is in the

4    courtroom.  She has not been interviewed by Pretrial.  She's a

5    US citizen, has 2 children, 10 year old XXXX and a 7 year old,

6    XXXX, and Mr. Rodriguez --

7            THE COURT:  Let me ask you about that, Mr. Salinas.

8    Is Pretrial going to -- are they going to interview Genesis

9    Cabrerra?  Did you tell them?

10            MR. SALINAS:  I would like for them to --

11            THE COURT:  Okay.

12            MR. SALINAS:  -- to interview her.  She's in --

13    she's in the courtroom, Judge.

14            THE COURT:  Okay.

15            MR. SALINAS:  So she has 2 children that are hers

16    and basically are Mr. Rodriguez's step-children.  He's been

17    helping to support them.  He's also got 2 children in Puerto

18    Rico, 9 year old XXXXX and 7 year old XXXXX that he is

19    supporting, sending money to.

20            He is employed, he works for Aztec which is a -- I

21    guess an event company, that they do events and they put up

22    tents and stuff like that.  So he's been working for them.

23            And the Pretrial Services Report actually got into

24    his mental health.  He does suffer from ADD, he's been

25    diagnosed with that as a child.  And he did do a 3-month drug

1    program back in 2014 on the Connecticut felony drug charge.

2    So he -- he has been through an inpatient treatment program.

3              He's got a place to live with his common law wife

4    and the 2 children, and he's got a job.

5              And he's been on bond for 3 months on a felony case,

6    a misdemeanor case and the other felony case.  He's complied

7    with those conditions.  His wife made a $41,500 bond where she

8    paid 10 percent down and he has to comply with the bondsman

9    and the Court in order for him to remain out on bond, and he

10   remained out on bond until the time he was taken into custody

11   on December 14.  So I would basically think the Court could

12   fashion something to allow him to remain out on bond.

13             THE COURT:  Okay.  Thank you.  Is -- Mr. Salinas, is

14   that your client?  Someone's raising their hand to get your

15   attention.

16             MR. SALINAS:  No, the lady (indiscernible).

17             THE COURT:  Oh, okay.

18             MR. LEONARD:  That's Ms. Kelly, that's my client's

19   aunt.

20             THE COURT:  Okay.  Did you want to ask her before we

21   continue, did she want to --

22             MR. LEONARD:  Sure, let me check.

23        (Pause in the proceedings.)

24             MR. LEONARD:  Judge, I just want to convey one --

25             THE COURT:  Okay.

1          MR. LEONARD:  -- quick fact -- two things really,

2     really quick.

3          THE COURT:  Sure.

4          MR. LEONARD:  She wanted me to let the Court know

5     that my client has worked for her son who just recently passed

6     away, that he worked for him pretty regularly so that, you

7     know, just to once again show his level of responsibility.

8          One other thing that I wanted to point out, Judge,

9     one person that I forgot that I wanted to highlight by way of

10    proffer is Ms. Christina Zamora who is my -- the mother of my

11    client's 9 year old son.  She flew all the way here from

12    California.  And there's been some testimony about Mr. Hopkins

13    going to California.  Much of that is to visit his child.

14         Ms. Zamora -- Ms. Zamora Lee (phonetic) would

15    testify that Antonio is a very present father, very involved

16    in his son's life.  They've been separated in their

17    relationship for a while but they have a great co-parenting

18    relationship.  He's supports her financially, emotionally so

19    that he's very involved in his child's life.  So I did want to

20    highlight that.  And I've given her information to Pretrial

21    Services and hopefully they will have an opportunity to

22    interview her.

23         THE COURT:  Okay.  So before we move on to argument,

24    let me just make sure from Pretrial.  So as to Mr. Hopkins

25    you'll give an amended report with the interviews.  Then as to

1     Mr. Milson, his attorney will provide you by Thursday with

2     information of who you can interview and then you'll provide

3     me with an amended report after he gives you the information.

4     And then Mr. Rodriguez provided Ms. Cabrerra's name to be

5     interviewed, so I'll wait to get those reports.  Okay.

6            So let's start with argument.  So this is what we're

7     going to do, we'll hear from Mr. Leonard, Mr. Tausk, Mr.

8     Murphy, Mr. Salinas because you all have the burden.  And then

9     we'll hear from Ms. Collins, and then we will -- we will

10    conclude.

11           Ma'am, did you have something else you wanted to

12    say?

13           MS. KELLY:  Yes, sir.

14           THE COURT:  Okay.  Why don't -- you can come forward

15    and just tell me --

16           MS. KELLY:  I don't walk --

17           THE COURT:  -- because I want you to feel like you

18    can be --

19           MS. KELLY:  -- I don't walk very good, I

20    have (indiscernible) --

21           THE COURT:  Okay.  Then can someone bring her a

22    microphone?

23           MS. KELLY:  -- a bad accident (indiscernible)--

24           THE COURT:  Well, then just stay put.

25           Does one of those microphones extend?

1          MS. KELLY:  Thank you, sir.  But I did it to let you
2   know --
3          THE COURT:  Hold on one second.  We've just got to
4   be able to make sure we've got a Record.  Oh, wait, we have a
5   mobile one.
6          MS. KELLY:  Thank you.
7          THE COURT:  Hold on.  There we go.
8      (Pause in the proceedings.)
9          MS. KELLY:  Thank you, Judge.  I work for the
10  courts --
11         THE COURT:  Hold on one second, we're just trying to
12  make sure we can record.  Oh, there we go.
13         UNIDENTIFIED SPEAKER:  It takes a minute.
14         MS. KELLY:  Thank you.
15         THE COURT:  Just tell us what your name is.
16         MS. KELLY:  My name is Vassy (phonetic) Kelly.
17         THE COURT:  And you are the aunt to Defendant
18  Antonio Hopkins-Yezeno?
19         MS. KELLY:  That's correct.
20         THE COURT:  Okay.  Go ahead, ma'am.
21         MS. KELLY:  I took Tony and his brother in at age 2
22  and 4 because they were a bit neglected and the courts decided
23  that I would be a good parent if I would take them.  I raised
24  those boys pretty much all their lives.  They're to me the
25  same as my children.  I love them dearly.  But this is not

about love. It's about obedience, the way (indiscernible).

My husband is an elder in the Church of Christ. And I'm a teacher there. But I also had a business for senior citizen care, it's a nursing home. I only was able to -- I had to close it down 4 years ago because of the bad (indiscernible). I have proof that Tony and Kevin both worked for me from time-to-time in the nursing home. That I can prove.

Also, I wanted you to see this because I just lost my son. This was 5 days ago. He owned 16 Wendy's Hamburgers (indiscernible) 16 stores (indiscernible) attended by over 500 officers and business owners of the business.

I also want you to know that my granddaughter is -- also works here for the court. She just graduated from college a year ago. She's a judge, a juvenile judge. My niece also worked at the courts. She's been here 32 years. She is also a judge in the court.

I'm not saying this to brag to you about anything. I know everybody do -- a lot of people would do a lot of things. But Tony and Kevin didn't have a chance to do too much bad stuff. I've never seen Tony with a cigarette in my life. He knows that it would have been forbidden around me.

About 2 years ago Tony needed transportation to get back and forth from work. I did something that I probably -- I said I never would have done before. But he

1    (indiscernible).  So I got him a car.  I didn't give him a

2    car, Tony pays for the car.  I just put the car in -- I didn't

3    put it in my name, I put it under my (indiscernible) name.

4    And Tony has not missed a single note.  He has 4 years to pay

5    for it, but he's paid for it 2 years and 3 months.

6         I've never seen Tony with a phone around me too

7    much.  Tony goes to California about once every 2 to 3 months

8    because he has a son out there.  A son that -- by a woman he

9    was not legally married to.  He loves that little boy, he's --

10   that little boy's about 4 years old.  Tony goes back and forth

11   to see him about every 2 months.  Sometimes he brings him back

12   here, and he stays here with him about 2 weeks sometimes at a

13   time.

14        Just wanted you to know, Judge, I don't know any of

15   these kids.  None.  A lot of them (indiscernible), a lot of

16   things are fair and a lot of things not fair.  If Tony had

17   more than a misdemeanor record, he would deserve probably a

18   lot more, and I would shake your hand for giving it to him.

19   But I beg you to give Tony a chance, Antonio, please give him

20   a chance, because with me he knows he won't get away with

21   anything.

22        The room -- you may look at my house, you may see

23   it -- you'd -- it be pretty doubtful they have missed it.

24   It's 5 bedrooms, and there's a 6th over the garage where I

25   would put Tony.  So it would not be allowed at my house to

1    have any additional company without me knowing and even then

2    it would be none of his street friends.

3         He will never be allowed around a weapon or be --

4    have access to marijuana cigarettes, or any kind of

5    (indiscernible).  I will turn him in myself if I found

6    anything such.  So having a misdemeanor is bad enough, but I'm

7    begging you, Judge, to give him a chance.  That's all I say,

8    give him a chance.  He's a good boy.  I know he's a good boy.

9         What I always loved about him.  I raised him and his

10   brother both.  What I loved about Tony is he was always

11   telling me the truth.  If he did something wrong, and he --

12   Kevin will lie in a quick minute, telling me -- he'd say,

13   Kevin, stop lying, tell Aunt Vassy the truth.  You won't get a

14   spanking if you tell Aunt Vassy the truth.  He would tell me

15   the truth.  That's what I loved about him, his truthfulness.

16        I know he's not -- every kid has done something

17   wrong.  He's not the only child I've raised.  Me and my

18   husband, we had both children legally by marriage.  I raised

19   Tony and Kevin, they were my niece and nephew (indiscernible)

20   daughter.  And my son here I just lost a week ago.  He was the

21   one (indiscernible) with 14 Wendy's Hamburgers.  He also has a

22   dairy farm and he has about 14, 16 men that work for him.

23        There is no lack of work around my house, all for

24   Tony to have the space that he would be sharing -- living in,

25   I welcome any one of you to come by and inspect it.  I want

1    you to come in and inspect it.  The doors are securely locked.

2    We carry a locked house at all times with lots of cameras.  He

3    would not stand a chance of getting out of my house without my

4    knowing about it.

5            I also live right directly across the street from a

6    Houston Police officer.  He's a sergeant.  My brother is also

7    a sergeant with the Houston Police Department.

8            Just want you to know the kind of person that I am.

9    I don't play.  I don't play at all.  I have 3 kids that have

10   graduated from college, and the 4th is in school now.  I

11   worked hard for a living all my life.  Tony's no exception.

12   He has to work.  I don't tolerate mess, I don't tolerate

13   (indiscernible), I don't tolerate (indiscernible), and I don't

14   tolerate bad company that he -- that's his problem.  He's been

15   running around with bad company.  But with me you check them

16   out.

17           THE COURT:  Thank you, ma'am.

18           So let me take a few minutes before -- to go off

19   script for a second, ma'am.  I appreciate what you're saying,

20   and I think the hardest thing as parent, and I know this with

21   3 adult kids, is -- and mine are adopted, is that we do our

22   best as parents and there's nothing more painful when we're in

23   this -- when we're in the situation we're in in the courtroom.

24           But we can't always be responsible for our grown

25   children's actions, and we don't always know, no matter how

1    hard we try, we don't really know what our kids are up to.

2    And there's a part of us, because we love our kids so much,

3    that we become -- we become blinded to what's really going on.

4         I only have a limited role in your -- in your

5    nephew's case.  I just make a bond decision.  But ultimately

6    all 14 Defendants are going to have to decide whether they're

7    going to plead guilty or they're going to go to trial.  But

8    they're facing -- they're facing very serious charges in this

9    case.  I'm just making a decision whether they get on bond

10   till they go to trial.

11        But the bigger decision in this case is -- that they

12   all face is the decision do they go to trial or they plead

13   guilty.  But they're all facing -- ma'am, they're all facing

14   mandatory minimum cases, meaning that if they're convicted at

15   trial, they face a minimum, a minimum of 10 years in federal

16   prison up to a maximum term of life.

17        And in the federal system you do 85 percent of that

18   time.  There's, no, you do 2 years, you know, out of a 10-year

19   or life sentence.  So every person in this case, if they're

20   convicted at trial, most likely they're going to go to federal

21   prison for at least 10 years.

22        In your nephew's case, again, I don't know all the

23   facts, but just what's in front of me, what we heard from the

24   Government is they have him on video on at least 3 occasions

25   selling drugs that get him over that mandatory minimum.  They

1     actually have him on video selling the drugs.

2           Now I'm not telling him -- the greatest thing about

3     our country is if you want to go to trial and -- you get to go

4     to trial and no one can convince you otherwise.  But I'm just

5     telling you he's on video selling drugs, and if a jury

6     believes that video, he's going to go to prison for over 10

7     years.  And so the decision I make today is just whether he

8     remains on bond or not.

9           And I sound like a broken record and I apologize,

10    because everyone in this courtroom's probably heard the same

11    story I'm about to tell you 5 times, but you've never heard

12    it.  Before I became a judge, my role as an attorney was

13    equally spent on both being a federal prosecutor and being a

14    defense attorney.

15          But my proudest moment in life, other than adopting

16    kids, was representing 7 different federal defendants that

17    were serving federal life sentences who are now free.  But all

18    of these people were guilty, and they all went to trial, and

19    they all received life sentences.  And then many years later,

20    me as your pro bono attorney, convincing the Government or the

21    president, convince them to get a second chance after they'd

22    spent multiple years in prison.

23          And that's why I say, like we can argue this is an

24    important decision on the bond, but in reality the decision

25    facing all of these Defendants and what are they going to --

1    they're going to be making the most important decision in

2    their life.  If they want to go to trial, then they can go to

3    trial, but if they're convicted, they face such a heavy

4    sentence.

5         And so I'm not making a decision on the bond

6    situation because I need more information today.  And I

7    appreciate your saying, but again, your nephew's criminal

8    history goes -- there's no felonies but the criminal history

9    goes back to 2006 and he's on video in this case, and that --

10   and you've done your best, and that's absolutely no reflection

11   on you, but there's obviously, to all of us, another side of

12   our children and our friends that sometimes we don't see, and

13   no matter how hard we try in life, we can't blame ourselves

14   because we're just -- we're just doing the best -- we're just

15   doing the best we can.

16        And so whatever decision I make, I don't want you to

17   take that as a personal reflection on you, because it has

18   nothing to do with you.  But you have to listen to what I'm

19   saying about like there's something obviously going wrong here

20   that doesn't match the person that you think your nephew is.

21   And that doesn't mean I won't give him a bond, I haven't made

22   up my mind.  But it's not the easy, simple, rosy picture that

23   anyone could portray.

24        So let me -- let me start with Mr. Leonard.  As to

25   all of you, again, I'm going to need that updated information,

1  but let me hear your arguments.

2          MR. LEONARD:  Sure.  And, Judge, do you want me to -

3  - just for clarification do you want me to address flight

4  risk?

5          THE COURT:  No, I don't need --

6          MR. LEONARD:  No?

7          THE COURT:   -- flight risk.

8          MR. LEONARD:  Okay.  All right.  Understood.  So,

9  Judge, I would submit that the Government has not shown by

10  clear and convincing evidence that the --

11          THE COURT:  Well, let me start with -- rebut the --

12  why do you rebut the presumption and then tell me why they

13  can't prove by clear and convincing, because it's your burden.

14          MR. LEONARD:  Absolutely.  Judge, the Government,

15  they have not shown by clear and convincing evidence that Mr.

16  Hopkins is a danger or a flight risk.  You know, there's been

17  some talk about -- there have been no indications that Mr.

18  Hopkins was involved in any -- in any violence, no evidence

19  that he used a firearm against anyone, no evidence that he is

20  trafficking in firearms.  You heard the agent testify that

21  when he was arrested and taken into custody he was peaceful,

22  didn't try to run, didn't have any guns at the residence.

23          Judge, we would submit that all of these facts indicate

24  that Mr. Hopkins is a peaceful person and he's not interested

25  in running or being combative because of these allegations

70

that are against him.  And obviously they are very serious
allegations, but the Government has not presented any evidence
to show that he is a flight risk or a danger to the community.
So I would ask that the Court take that into consideration.

        Also, I would ask that the Court consider, you know,
his past criminal history.  As the Court alluded to, he
doesn't have any felony convictions, they're all misdemeanors.
There is the one allegation of participating in a riot, but,
you know, again, I think that if there were something
extremely serious going on in that case, this Court would hear
about it, and that's not the case.

        Judge, there's also been no testimony that alcohol
or substance abuse is an issue in this particular case, so I
would ask that the Court take that into consideration as well.
I think that there are a number of conditions that this Court
could set in place, including monitoring, so I would ask that
the Court set a $50,000 bond with monitoring, and if not, at
the very least home confinement.

        You've heard from Mr. Hopkins's family, from his
aunt, and I think that they have reassured this Court that
they would be a very solid third-party custodian who would
make sure that he does everything that he needs to comply with
this Court's order.

        THE COURT:  Thank you.

        Mr. Tausk?

1    MR. TAUSK:  Your Honor, with the Court's permission
2    I'd like to reserve until Thursday, until I get the updated
3    information.
4    THE COURT:  Okay.  So why don't you -- can you show
5    up at 9:00 so we'll --
6    MR. TAUSK:  Absolutely.
7    THE COURT:   -- we'll -- Shannon, we'll have -- put
8    him on the docket with the other folks.  Okay.
9    Then we'll hear from Mr. Murphy.
10    MR. MURPHY:  Thank you, Judge.
11    THE COURT:  Thank you.
12    MR. MURPHY:  On the issue of danger to the
13    community, which I'll limit my argument to, I think there are
14    2 factors that clearly get us over the hump on the
15    presumption.  The first is that Mr. White has been charged
16    with 1 case which occurred on September 15, 2021.  We heard
17    the DIA agent that there was no guns, no violence related to
18    that case.  And that occurred on September 5, 2021 (sic).
19    He's not arrested until December 14 of 2022.  That's 15 months
20    later.
21    I think the very reasonable inference, Your Honor,
22    is this, is that if the Government really thought that this
23    guy is a danger to the community, of course that's what the
24    Court is deciding, they wouldn't let him sit out there in the
25    world for 15 months.  It just doesn't make any sense.  It's

1    very inconsistent with the position that they're taking now.

2         All the other facts that they've been arguing

3    existed on September 15, 2021.  Everything they're saying now

4    existed then.  But for some reason now, he's such a danger to

5    the community he can't -- he can't be out on bond where there

6    are conditions that will ensure that he can't do this anymore,

7    you know, assuming he did it the first time.

8         That leads me to my second point.  So the first

9    point is 1 case, there's no allegations of violence and he was

10   left out for 15 months.  And the second is that you're in a

11   position, Judge, of having a bit of a track record here with

12   Mr. White.  He's been 9 months on GPS, which is the only --

13   the best way obviously to keep tabs on someone and to inhibit

14   their ability to do -- become a danger to the community, 9

15   months without any allegations of violating that order, 9

16   months without going outside his front door.

17        And with those 2 things, Judge, I think that Mr.

18   White has clearly overcome the presumption that he's a danger

19   to the community.  There are conditions of release that you

20   can set, mainly that he continue on his monitor that will

21   ensure that he won't be a danger to the community.

22             THE COURT:  Okay.  Thank you.

23             MR. MURPHY:  Thank you.

24             THE COURT:  Mr. Salinas.

25             MR. SALINAS:  Yes, Your Honor.  I would just

73

1   basically state that Mr. Rodriguez has been out on bond for 3

2   months prior to getting arrested on the federal case.  The

3   federal case is basically the same case that he has in

4   Galveston.

5          The family, the common law wife has made the $41,500

6   bond, and I would think that if the Court could fashion

7   electronic monitoring, he could continue to work for his

8   company that he's been working for, the Aztec (indiscernible),

9   and he could support his wife and 2 step-children and 2

10  biological children.  He needs to be out, he needs to work,

11  and I believe that there are some things that the Court could

12  fashion to help him attain that.  Thank you.

13         THE COURT:  Okay.  Ms. Collins.

14         MS. COLLINS:  Yes, sir.  I'll start I guess in

15  order --

16         THE COURT:  Okay.

17         MS. COLLINS:  -- that they went.  First of all, as

18  to Antonio Hopkins-Yezeno, defense counsel mentioned the riot,

19  not knowing the underlying facts.  I do have those underlying

20  facts if the Court wishes for a proffer on what the rioting

21  stemmed from.  Obviously Agent Myszka wasn't familiar with

22  those facts, but I am if the Court would like to hear them.

23         THE COURT:  Okay.  I'll let him -- I'll let Mr.

24  Leonard speak after if he wants to after what you're going to

25  tell me.

1          MS. COLLINS:  Yes, Your Honor.  The riot occurred at

2     a concert.  The Defendant was with a group of men, all

3     connected with The Sauce Factory that you heard about earlier,

4     when shots were fired into the crowd against rival gang

5     members.  I'm not sure why Harris County made the decisions

6     that they did that led to misdemeanor as opposed to the

7     original felony that they were charged with, but those are the

8     underlying facts.  I don't have the --

9          THE COURT:  Was he -- was there allegations that he

10     fired the shots, or he was just with the people that fired.

11          MS. COLLINS:  I believe he was just with a group of

12     individuals that did so, and that may be why he got a

13     misdemeanor as opposed to the felony charge that he was

14     originally charged with.

15          That aside, obviously this s a presumption case.  I

16     do not believe that that presumption has been overcome.  The

17     reason for that is, and this may change perhaps once Pretrial

18     gives us more information about the background and the

19     address, but as of yet I still have yet to hear an address to

20     know where that's located, what, if any, information we have

21     about that address moving forward.

22          THE COURT:  Okay.  Let me just say on that, I think

23     what they proffered is that he would be living with Ms. Kelly,

24     who just spoke to us.

25          MS. COLLINS:  Yes.

1          THE COURT:  Whatever her address is, that would be

2     the -- and I presume that's the address.

3          MS. COLLINS:  And do we have that address?

4          MR. LEONARD:  We do.  I have that address.  It's

5     1503 Chart Drive, Crosby, Texas 77532.  It's a house, they've

6     lived there for over 30 years and they own that home, and I

7     believe that information will be provided to Pretrial

8     Services.

9          THE COURT:  Okay.

10          MS. COLLINS:  That having been said, as we heard Ms.

11     Kelly speak, she's known the Defendant her entire life.  She's

12     been around him, he's currently chosen to keep things from

13     her, and activities from her.  And I would submit to the Court

14     that that won't change whether or not he's in her house or

15     not, despite her best expectations and hopes for her nephew.

16     And I believe that she truly wants him to go down a better

17     path.

18          But I think he has proven that he's going to go his

19     own way.  And despite the fact that there may not be felonies

20     in his history, we do know that there is a continued history,

21     and not just with the underlying charge, but going all the way

22     back to his juvenile days, a continued decision to make

23     decisions that enter into the criminal realm, including

24     carrying a weapon charges.

25          I mean the current charge that he is on bond for is

1    drugs in relation to him also carrying a weapon.  And while it

2    reads as a misdemeanor because he's not a felon, I think it

3    goes to the violent nature of drug dealing and why it is

4    considered a presumption of a danger to the community.

5          So I believe that, despite those contentions, he has

6    chosen the path that he is going to be on, and there's no

7    conditions that will ensure, especially (indiscernible) the

8    nature of narcotic sales and his ability and the way that he

9    has conducted himself in those sales both here and in

10   California.

11         Moving on to -- and I believe we're going to argue

12   Brandon Milson on Thursday.  Is that a correct --

13         THE COURT:  Yeah.

14         MS. COLLINS:   -- understanding?

15         THE COURT:  That's correct.

16         MS. COLLINS:  All right.  Then moving on to Torree

17   White, he does have a history of revocations, both -- 2

18   separate revocations in his criminal history that again is

19   consistent.  He is consistently in and out of the criminal

20   justice system showing a choice that he has made to engage in

21   certain types of behavior.

22         And I do go back to the fact that not only are drugs

23   considered, especially this amount, presumed to be a danger to

24   the community, but I would argue, despite the fact that it is

25   a state charge, that in our federal system promotion of

1    prostitution and prostitution cases, or pimping cases as we

2    often call them, are also considered to be a presumptively

3    danger to the community.  And he has engaged in both of these

4    activities.

5         And I think going back to the cell phone, and

6    there's also Instagram and things of that nature, but it goes

7    to the inherent ability to conduct that criminal activity no

8    matter where you are, by phone, by internet, despite the fact

9    that he may be at home -- in a home confinement situation.

10    And for all those reasons I do not believe that that

11    presumption has been overcome.

12         With regard to Josue Rodriguez, Your Honor, I

13    understand that this is not a presumption case, nevertheless

14    given the 2-year TDC trip, or I don't know if that's exactly

15    what they call it in Puerto Rico, but the prison trip based on

16    an underlying charge which involved weapons again, then coming

17    here engaging in a situation where he is on the phone talking

18    about how he's going to go commit a hit for someone, where he

19    is literally headed to commit violent activity to the point

20    where law enforcement believes they have to intercede in that

21    moment to prevent violence, and he, in fact, does have a

22    firearm on him.

23         And then in conjunction with what they're hearing on

24    the phone, the phone -- intercepted calls with what they're

25    actually seeing in the phone which is photos and text messages

1    of sales of firearms, innately dangerous to the community.

2    For all those reasons I would argue -- and again, kind of

3    going back to the cell phone situation, we just live in a

4    different world, Your Honor, where criminal activity can be

5    conducted from almost anywhere as long as you have the

6    appropriate means like a cell phone.  And for all of those

7    reasons I don't believe that there are any conditions that

8    could be fashioned that would ensure him to not be a danger to

9    the community.

10                THE COURT:  All right.  Thank you.

11                Did you want to say something, Mr. Leonard?

12                MR. LEONARD:  Yeah, Judge, just --

13                THE COURT:  Sure.

14                MR. LEONARD:   -- briefly I wanted to address the

15    riot allegations that the Government went into.  So, Judge, I

16    just wanted to point out for the Court by way of proffer that,

17    again, Mr. Hopkins pled to a misdemeanor.  I've looked at the

18    complaint in this case, it's a long 3-page multi-paragraph

19    document that describes a lot of activities.

20                What I can tell you that's not in there, there's no

21    description of Mr. Hopkins having a weapon, using a weapon,

22    using a firearm.  There's not even any indication that he

23    threw a punch.  What it says is that he was with a group and

24    that he was there trash talking.

25                You know, this was over 12 years ago, he was 20

79

1    years old at the time, so I would ask that the Court take

2    those facts into consideration when considering the

3    seriousness of that offense, as well as his participation in

4    that offense.

5            THE COURT:  Okay.  Thank you.

6            MR. LEONARD:  Thank you.

7        (Hearing adjourned 1:02 p.m.)

8                        * * * * *

9        *I certify that the foregoing is a correct transcript*

10   *to the best of my ability produced from the electronic sound*

11   *recording of the proceedings in the above-entitled matter.*

12     */S./ MARY D. HENRY*

13   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

14   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

15   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

16   *JTT TRANSCRIPT #69552*

17   *DATE FILED:  FEBRUARY 12, 2025*

18

19

20

21

22

23

24

25